**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

| | | |
|---|---|---|
| UNION BANK, | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | Case No. 4:10-CV-00714-DGK |
| | ) | |
| GABRIEL C. MURPHY, | ) | |
| | ) | |
| Defendant/Counterclaim Plaintiff. | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case arises from a $3 million loan Plaintiff/Counterclaim Defendant Union Bank extended to Murphy Properties II, LP which Defendant/Counterclaim Plaintiff Gabriel Murphy guaranteed. Murphy Properties II, LP allegedly defaulted on the note, and Union Bank is now suing Gabriel Murphy pursuant to the guarantee. Gabriel Murphy asserts counterclaims against Union Bank for negligent misrepresentation, fraudulent misrepresentation, and the tort of wrongful foreclosure.

On April 10, 2012, the Court held a bench trial in this case, and the parties subsequently submitted proposed findings of fact and conclusions of law (Docs. 52, 53). After carefully considering the evidence adduced at trial and the parties' arguments, the Court now issues its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

The Court finds that Union Bank has proven its claim for breach of guarantee, that Murphy's counterclaims are barred by Missouri's commercial credit agreement statute of frauds, and that even if the commercial statute of frauds did not apply, Murphy failed to prove the counterclaims. The Court holds Union Bank is entitled to a deficiency judgment of

$1,555,592.36, plus interest of $167,597.50 as of September 1, 2012, with interest accruing at a rate of $213.50 per diem, and reasonable attorneys' fees and expenses of $27,000.00.

## Findings of Fact

The Court finds the relevant facts to be as follows.

**1.     The Loan Documents**

Murphy Properties II, LP ("Murphy Properties") is a limited liability partnership. Murphy Properties is owned by Murphy Properties, LLC, which is solely owned by Defendant/Counterclaim Plaintiff Gabriel Murphy ("Murphy").

On January 25, 2006, Murphy Properties entered into a Construction Loan Agreement, Loan No. CML-6298, with Plaintiff/Counterclaim Defendant Union Bank to secure a construction loan from the bank. Murphy Properties executed a Note in the principal amount of $3,001,100.00. The bank held and serviced the Note. The Note was secured by a Deed of Trust dated January 25, 2006, in favor of Union Bank, as Grantee, and David V. Kenner, as Trustee (the "Trustee") on piece of commercial office property located at 10920 NW Ambassador Drive, Kansas City, Missouri ("the Ambassador Property"). The Deed of Trust granted the Trustee a secured interest in the Ambassador Property for the benefit of Union Bank, a first lien against the Ambassador Property.

Union Bank conditioned this loan ("the Ambassador loan") on Murphy personally guaranteeing it. On January 25, 2006, Murphy executed a Guaranty Agreement (the "Guaranty") and delivered it to the bank. Union Bank relied on Murphy's execution of the Guaranty in making the loan to Murphy Properties.

In relevant part, the Guaranty states:

> 9.  Lender's Collection Rights Against Guarantor; Collateral.
> Guarantor agrees to pay Lender any and all costs, expenses and

2

reasonable attorneys' fees, to the extent not prohibited by applicable law, paid or incurred by Lender in collecting or endeavoring to collect any Liabilities or in enforcing or endeavoring to enforce this Guaranty whether or not suit be brought, and attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals.

### 2. Murphy's Default and the Proposed Global Restructuring

Murphy, or one of the entities he owned, also owned other properties which Union Bank had loaned money on and in which Union Bank held a security interest. One such property was the Mission Towers office building ("the Mission Towers Property") located in Mission, Kansas, which was owned by Mission Towers Properties I, LLC.

After the recent recession, Murphy began experiencing cash flow problems with the Mission Towers Property and could not pay a variety of vendors for work performed or services rendered. Mechanics liens were placed on the property.

On September 11, 2008, Union Bank as lender and Mission Towers Properties I, LLC as borrower/owner of the Mission Towers Property entered into an escrow agreement with Kansas City Title acting as the escrow agent. Under the agreement, Union Bank made a third loan on the Mission Towers Property. Union Bank loaned $1,242,986.38 ("the Escrow Funds") which was placed into escrow. Under the escrow agreement, the Escrow Funds were to be used to indemnify Kansas City Title for any claim paid to Union Bank under the title policy that arose from certain mechanics liens that had been placed on the property.

At this time Murphy, by himself and through other entities he owns, had five loans with Union Bank. Three loans on the Mission Towers Property, one on Murphy's personal residence ("the Home loan"), and one loan on the Ambassador Property. Murphy had personally guaranteed all five of these loans.

3

One contractor that had not been paid for its work on the Mission Towers Property, Malnar Construction ("Malnar"), filed suit on its mechanics lien. Union Bank was named as an additional defendant in this lawsuit because there was a dispute between Malnar and Union Bank concerning whose lien had priority.

While this litigation was ongoing, on January 10, 2009, Murphy Properties defaulted on the Note on the Ambassador loan.

In March of 2009, Malnar obtained a judgment for approximately $600,000 against Mission Towers Properties I, LLC and a ruling that its mechanic's lien had priority over the bank's mortgage lien. Shortly thereafter, Malnar began to execute on the judgment by noticing up its intent to conduct a Sheriff's Sale of the Mission Towers Property on August 12, 2009. Believing such a sale was not in either of their interests, Union Bank and Murphy began working toward a solution ("the Global Restructuring") that would clear title to the Mission Towers Property and also bring the Home loan and the Ambassador loan current.

On August 7, 2009, Brian Lee ("Lee"), an Executive Vice President with Union Bank, sent an email to Murphy in which he outlined a proposal for the Global Restructuring. Under the proposal, Union Bank would bring the Home loan and the Ambassador loan current with the balance from the Escrow Funds after title to the Mission Tower Properties was cleared and Murphy executed the necessary loan documents. Restructuring Murphy's debts with more favorable terms was necessary for Union Bank to bring the loans current because it was not in either Union Bank's or Murphy's best interests for Murphy to default again at a future date.

Under any restructuring of the loans, Murphy would have to execute new loan documents to obtain new loan terms. Murphy was aware of this requirement. Following Union Bank's proposal on August 7, 2009, the parties continued negotiating the terms of the Global

Restructuring through e-mails and oral conversations. At the same time, Murphy worked toward clearing title on the properties.

As of August 2009, Murphy was in default on three of the five loans he had with Union Bank, and maturity default was approaching in 2010 on the two remaining loans. In August, the Escrow Funds were used to satisfy Malnar's claims against the Mission Towers Property. Between October and December of 2009 the Escrow Funds were also used to satisfy other mechanics liens and other claims on the Mission Towers Property.

Union bank drafted loan documents for its proposed Global Restructuring and provided them to Murphy for his execution in November 2009. Murphy claims he executed the documents in late December 2009 and January 2010, and that the executed documents were delivered to Union Bank. The Court finds Murphy's testimony is not credible and these assertions are not true. Murphy never executed the loan documents Union Bank provided him for the Global Restructuring, nor did Union Bank ever receive any executed loan documents from Murphy concerning the Global Restructuring.

What, in fact, happened is that throughout late 2009 and early 2010 Murphy made various proposals to Union Bank regarding the proposed terms of a restructuring, constantly trying to negotiate better terms as his financial situation continued to deteriorate. On December 30, 2009, Murphy sent an email to Lee expressing concern with Union Bank's proposed terms for the Global Restructuring. Lee responded on December 31, 2009, writing:

> The loan documents for Mission Towers Properties I, Murphy Properties II, and your home loan were sent to you on November 9, 2009. Since that date, we have had numerous discussions regarding the terms contained therein. The consistent message to you in those discussions has been that the documents contain everything Union Bank is willing and able to do to restructure your loans.

> Given that you and your attorney have been pushing us to close on the loans by year end, I was more than a little surprised to receive your email yesterday wherein you requested a long list of major changes to the loan terms.
>
> . . .
>
> I will conclude by saying that we are unable to do anything other than what is spelled out in the existing loan documents. The requests that you made in your email are rejected. If you are unhappy with the terms we have offered you, you do not have to accept them.
>
> . . .
>
> If you choose to reject the restructuring of the loans that we have offered to you, I would encourage you to immediately present a plan to us on how you will address the severe delinquency that exists under your loans.

Murphy continued to make new proposals. On March 17, 2010, Murphy emailed Lee stating, "Alternatively, I am proposing Union Bank keep these loans under a structure whereby we 'reset' these loans." On April 5, 2010, Murphy emailed Lee stating, "I have yet another proposal to Union Bank on the 3 properties. I believe the proposal will be satisfactory to the bank as it relates to potential payoff of the residential loan and how I propose to deal with Ambassador I loan."

The fact that Murphy continued to discuss restructuring the loans as late as April 2010 reinforces the Court's conclusion that Murphy did not execute the Global Restructuring documents in December 2009 or January 2010, or at any other time, and never returned executed loan documents to the bank. Had Union Bank received such documents from Murphy, it would have executed the documents and brought Murphy's loans current as provided for in the Global Restructuring. Thus, the Ambassador Loan was never restructured.

6

On April 7, 2010, a rain storm heavily damaged the electrical system at the Ambassador Property. Rain swept landscaping mulch into a storm drain, clogging the drain and diverting large amounts of rainwater into the building's basement which housed the electrical system. As a result, numerous tenants left the building and Murphy's financial position worsened.

### 3. The Ambassador Property Foreclosure

Also on April 7, 2010, Union Bank sent Murphy Properties via certified mail a Notice of Default/Demand/Acceleration. On April 23, 2010, Union Bank sent Murphy via certified mail a Notice of Demand under the Guaranty Agreement. These letters notified Murphy that Union Bank would exercise all rights and remedies including the sale of the Ambassador Property at public sale without further notice if Murphy did not make payment.

On June 11, 2010, Union Bank sent Murphy Properties and Murphy via certified mail a Notice of Trustee's Sale. The notice specified that the Ambassador Property was scheduled to be sold on Friday, July 2, 2010, at 2:00 p.m. at the South Door of the Platte County Courthouse. Publication of the Notice of Trustee's Sale appeared in The Landmark on June 9, 2010; June 16, 2010; June 23, 2010; and June 30, 2010. On or about July 9, 2010, the Ambassador Property was sold at a public auction at the South Door of the Platte County Courthouse. Union Bank bought the Ambassador Property at the auction for $1,601.600.00, leaving a deficiency on the loan of $1,558,592.36.[1]

Murphy has not made payment to Union Bank to satisfy the amount owed on the Ambassador Loan, and he is in default. Default interest accrues on the Note in the amount of $213.50 per diem.

---

[1] How much of this figure is principal and how much is interest and fees is unclear. But, the uncontroverted evidence on the record is that the total deficiency is $1,558,592.36.

Union Bank has paid its attorneys $58,159.67 for legal work relating to enforcing the Guaranty, work on the Mission Towers Property, and work on other matters related to Union Bank's dealings with Murphy. However, the invoices submitted by Plaintiff's counsel indicate there is some overlap in the amount the bank paid for legal work enforcing the Guaranty with other legal work related to Murphy that Plaintiff's counsel performed for Union Bank. After carefully considering the amount of time needed to prosecute this case, including time spent writing motions, preparing for trial, and preparing post-trial briefs, the Court finds that the reasonable amount of attorneys' fees Union Bank incurred solely in enforcing the Guaranty is $25,000, and the reasonable amount of legal expenses incurred is $2,000.

## Conclusions of Law

**I.      The Court finds for Union Bank on its claim for breach of guaranty.**

The Court holds Murphy is in breach of the Guaranty and is liable to Union Bank for the deficiency balance owed on the Note. Under Missouri law, to recover on a contract of guaranty the creditor must show: (1) that the defendant executed the guaranty; (2) that the defendant unconditionally delivered the guaranty to the creditor; (3) that the creditor, in reliance on the guaranty, thereafter extended credit to the debtor; and (4) that there is currently due and owing some sum of money from the debtor to the creditor that the guaranty purports to cover. *ITT Commercial Fin. Corp. v. Mid-America Marine Supply Corp.*, 854 S.W.2d 371, 382 (Mo. banc 1993).

At trial, Union Bank presented credible evidence that: (1) Murphy executed the Guaranty; (2) Murphy unconditionally delivered it to Union Bank; (3) Union Bank relied on the Guaranty in extending the Ambassador loan to Murphy Properties; and (4) Murphy Properties defaulted on the Note on January 10, 2009, Union Bank proceeded directly against Murphy for

8

payment under the Guaranty, and the deficiency on the Note is $1,555,592.36, plus interest of $167,597.50 as of September 1, 2012, with interest continuing to accrue at a rate of $213.50 per diem.

Accordingly, the Court holds Murphy is in default under the Guaranty. The Court also holds Union Bank is entitled to reasonable attorneys' fees and expenses totaling $27,000.

## II. Murphy's counterclaims are barred by Mo. Rev. Stat. § 432.047.

### A. Union Bank is permitted to belatedly raise its § 432.047 defense.

Union Bank argues that all of Murphy's counterclaims are barred by Missouri's commercial credit agreement statute of frauds, which in relevant part provides that a debtor may not base a claim upon or raise a defense to a credit agreement unless the agreement is in writing and sets forth the relevant terms and conditions. Mo. Rev. Stat. § 432.047.2.[2] In response, Murphy contends Union Bank has waived any defense under the statute by failing to plead it as an affirmative defense in its answer. Alternately, Murphy suggests that the statute and the statute of frauds do not apply to the facts in this case.

As a threshold matter, the Court holds Union Bank has not waived the defense. The Court is hearing this dispute pursuant to its diversity jurisdiction, and in a diversity case, the question whether a defense is an affirmative defense or not is answered by reference to state law. *First Union Nat'l. Bank v. Pictet Overseas Trust Corp., Ltd.*, 477 F.3d 616, 621-22 (8th Cir. 2007). When and how such a defense must be raised, and whether it has been waived, are procedural questions answered by the Federal Rules of Civil Procedure. *Id.* at 622.

Under Missouri law, statute of frauds "is an affirmative defense which must be pleaded and interposed by the party claiming its benefit." *Brooks v. Cooksey*, 427 S.W.2d 498, 502 (Mo.

---

[2] Mo. Rev. Stat. § 432.047.2 states that "A debtor may not maintain an action upon or a defense, regardless of theory in which it is based, in any way related to a credit agreement unless the credit agreement is in writing, provides for the payment of interest or for other consideration, and sets forth the relevant terms and conditions."

Case 4:10-cv-00714-DGK   Document 54   Filed 09/24/12   Page 9 of 15

1968).  Under Missouri's procedural rules, the defense is waived if not raised in the answer.  *Id.*

Under the Federal Rules of Civil Procedure, failure to plead an affirmative defense generally results in a waiver of that defense, but this is not always the case.  Fed. R. Civ. P. 8(c)(1); *First Union Nat'l Bank*, 477 F.3d at 622.  The Eighth Circuit has "eschewed a literal interpretation of the Rule that places form over substance," holding instead that "technical failure to comply with Rule 8(c) is not fatal" so long as the "affirmative defense is raised in the trial court in a manner that does not result in unfair surprise."  *First Union Nat'l Bank*, 477 F.3d at 622.  Thus, late assertion of an affirmative defense is permissible unless the party claiming waiver demonstrates that inclusion of the defense will result in unfair surprise or prejudice.  *Id.* at 623 (noting the counterclaim plaintiff "has not shown that he would be unfairly surprised or prejudiced by inclusion of the defense," so the court would construe the counterclaim defendant's assertion of the affirmative defense as constructively amending its pleadings).

Here, Murphy alleged the existence of an oral agreement when he filed his First Amended Counterclaim in November of 2010.  In the "General Allegations" section of this pleading, he alleged that the parties agreed in 2009 to use money held by Union Bank in an escrow account to bring the loan on the Ambassador Property current (Doc. 12 at p. 8, ¶ 5-7).  Murphy specifically alleged this agreement "was evidenced by emails and oral communications between Gabe Murphy and Brian Lee . . ."  *Id.* at ¶ 8.  Union Bank's subsequent Answer to Defendant's Counterclaim did not raise either a general reference to the statute of frauds or a specific reference to § 432.047 as an affirmative defense (Doc. 13 at 4-5).  Union Bank did not assert any § 432.047 defense until it filed its Trial Brief on April 5, 2012, five days before trial (Doc. 47 at 3-4).

So the question before the Court is whether Union Bank's belated assertion of its § 432.047 defense has unfairly surprised or prejudiced Murphy. The Court holds it has not. Union Bank's defense is premised on the factual assertions made in Murphy's Counterclaim Complaint, Murphy's Trial Brief, and Murphy's Proposed Findings of Fact and Conclusions of Law (Doc. 53). Consequently, because the defense is based on facts Murphy alleges, Union Bank's failure to raise § 432.047.2 before the close of discovery has not prejudiced Murphy by preventing him from engaging in discovery related to this defense, deprived Murphy of an opportunity to research the defense, or prevented him from presenting evidence rebutting the defense. In his opening statement, Murphy's attorney discussed the defense and argued it had been waived by the bank's failure to plead it in its Answer, demonstrating he had researched the issue and understood it. Furthermore, in his Proposed Findings of Fact and Conclusions of Law submitted post-trial, counsel developed this argument and cited relevant caselaw (Doc. 53 at 13). While five days is limited notice, given that the defense is not particularly complex or predicated on any unknown facts, the Court finds Murphy has not been unfairly surprised or prejudiced by the late notice. *See Grant v. Preferred Research, Inc.*, 885 F.2d 795, 797-98 (11th Cir. 1989) (holding statute of limitations defense asserted 18 days before a jury trial did not prejudice the plaintiff).

Accordingly, the Court holds Union Bank has not waived its § 432.047 affirmative defense.

**B.    Mo. Rev. Stat. § 432.047.2 bars Murphy's counterclaims.**

Additionally, the Court holds § 432.047 bars Murphy's counterclaims. As an initial matter, the statute applies to the facts of this case. It applies to any "credit agreement," which is defined as "an agreement to lend or forebear repayment of money, to otherwise extend credit, or

11

to make any other *financial accommodation*." Mo. Rev. Stat. § 432.047.1 (emphasis added). A "financial accommodation" includes any promise of forbearance or modification to the terms of a promissory note. *BancorpSouth Bank v. Paramont Properties, L.L.C.*, 349 S.W.3d 363, 363, 365-66 (Mo. Ct. App. 2011) (holding oral promises of forbearance and modification to the terms of promissory notes are governed by § 432.047); *U.S. Bank Nat.'l Ass'n v. Canny*, No. 4:10cv421CDP, 2011 WL 226965, at *2 (E.D. Mo. Jan. 24, 2011) (holding oral promises to modify loan agreements, guaranties, and forbearance agreements are governed by the statute). Thus, assuming for the sake of argument that the parties had reached an understanding whereby the bank would apply the Escrow Funds to the Ambassador loan or otherwise modify the loan, § 432.047 would govern such an agreement because it was a financial accommodation to Murphy.

Additionally, the statute bars Murphy's counterclaims. The text of the statute states:

> A debtor may not maintain an action upon or a defense, regardless of theory in which it is based, in any way related to a credit agreement unless the credit agreement is in writing, provides for the payment of interest or for other consideration, and sets forth the relevant terms and conditions.

Mo. Rev. Stat. § 432.047.2. The Missouri Court of Appeals has held that this language is very broad and "demonstrates the legislature's intent to eliminate *all* claims and defenses relating to a credit agreement if that credit agreement is not in writing." *BancorpSouth Bank*, 349 S.W.3d at 367-68 (holding claims of promissory estoppel and equitable estoppel based on oral promises barred by § 432.047) (emphasis added). Courts have consistently held that the statute bars all claims and defenses in any way related to a credit agreement unless the agreement is in writing. *BancorpSouth Bank*, 349 S.W.3d at 367-68; *U.S. Bank Nat.'l Ass'n*, 2011 WL 226965, at *3. This includes tort and contract claims. *U.S. Bank Nat.'l Ass'n*, 2011 WL 226965, at *2. In the present case, assuming for the sake of argument that the parties had reached an understanding

12

about a loan modification or accommodation, they never reduced the terms and conditions of this understanding to writing so the agreement is unenforceable.

Accordingly, the Court holds Missouri's commercial credit agreement statute of frauds bars Murphy's counterclaims of negligent misrepresentation, fraudulent misrepresentation, and wrongful foreclosure.

## III. Even if Murphy's counterclaims were not barred by § 432.047, they would still fail.

### A. Murphy failed to prove his both his fraudulent and negligent misrepresentation counterclaims.

Even if § 432.047 did not bar Murphy's counterclaims, Murphy's could not prevail on his fraudulent and negligent misrepresentation claims because he did not prove that Union Bank made a false material representation. The elements of a fraudulent misrepresentation claim are that the defendant speaker: (1) made a representation (2) that is false (3) and material; (4) the defendant knew the statement was false or the defendant was ignorant of its truth; (5) the defendant intended and reasonably contemplated that the statement would be acted on by the plaintiff; (6) the plaintiff did not know the statement was false and (7) relied on the representation being true; (8) the plaintiff had a right to rely on the statement; and (9) the plaintiff relied on the statement and was injured. *Harris v. Smith*, 250 S.W.3d 804, 808 (Mo. Ct. App. 2008). Similarly, the elements of a negligent misrepresentation claim are: (1) the defendant speaker supplied information in the course of his business or because of some other pecuniary interest; (2) due to the defendant's failure to exercise reasonable care or competence in obtaining or communicating this information, the information was false; (3) the defendant intentionally provided the information for the guidance of a limited group of persons in a particular business transaction; (4) the plaintiff listener justifiably relied on the information; and (5) as a result of the plaintiff's reliance on the statement, he suffered a pecuniary loss. *Id.*

The Court finds that, contrary to Murphy's assertions, Union Bank never promised or otherwise informed Murphy that it would apply the Escrow Funds to bring the Ambassador Loan current. Although Union Bank, through Brian Lee, discussed this possibility with Murphy as part of proposal to restructure the Ambassador Loan, the parties never reached any agreement. Murphy's claim that Brian Lee indicated that the bank would apply the Escrow Funds to the Ambassador Loan is not credible. Union Bank never stated that it would or could unilaterally apply the Escrow Funds to the Ambassador Loan. In fact, the credible testimony at trial was that the bank believed it could not do this unless the escrow agreement was formally amended in writing. Consequently, the Court rules for Union Bank on Murphy's misrepresentation claims.

**B. Murphy failed to prove his wrongful foreclosure tort claim.**

The Court also rules for Union Bank on Murphy's wrongful foreclosure tort claim. To prevail on a wrongful foreclosure tort claim, a plaintiff must prove: (1) the commencement of a foreclosure by sale (as distinguished from judicial action) of a deed of trust; (2) that at the time the foreclosure proceeding began, there was no default on the defendant's part that would give rise to a right to foreclose; so that (3) the foreclosure is absolutely void. *See Dobson v. Mortgage Elec. Registration Sys, Inc. v. GMAC Mortg. Corp.*, 259 S.W.3d 19, 22 (Mo. Ct. App. 2008). In the present case, the Court finds that Murphy Properties defaulted on the Note on January 10, 2009, thus there was a valid default when the foreclosure sale occurred and Murphy cannot prevail on this claim.

### Conclusion

For the reasons discussed above, the Court finds that Defendant Gabriel Murphy is liable to Plaintiff Union Bank for breach of guaranty. Union Bank is entitled to a deficiency judgment of $1,555,592.36, interest of $167,597.50 as of September 1, 2012, with interest accruing at a

14

rate of $213.50 per diem, and reasonable attorneys' fees and expenses of $27,000.00.  The Court also finds for Union Bank on Defendant/Counterclaim Plaintiff Gabriel Murphy's wrongful foreclosure tort, negligent misrepresentation, and fraudulent misrepresentation claims.

**IT IS SO ORDERED.**

Dated:  <u>September 24, 2012</u>                    <u>  /s/ Greg Kays                          </u>
                                                                    GREG KAYS,
                                                                    UNITED STATES DISTRICT JUDGE